UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| D&D Investments, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:21-cv-3700-BHH |
| v. ) | |
| ) | **Opinion and Order** |
| Majestic Marble and Glass Company, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon Plaintiff D&D Investments, LLC's ("D&D" or "Plaintiff") first amended complaint against Defendant Majestic Marble and Glass Company ("Majestic" or "Defendant"). (ECF No. 48). In its complaint, D&D alleges breach of contract and "Tortious and Intentional Interference With Contract/Tortious Interference With Prospective Contractual Relations – First PSA." (*Id.*) Defendant filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on March 3, 2023. (ECF No. 49). Plaintiff filed a response in opposition, and Defendant filed a reply. (ECF Nos. 64 & 66.) For the reasons set forth herein, the Court denies Defendant's motion to dismiss.

## BACKGROUND

Majestic entered into a Lease Agreement[1] (the "Lease") with D&D dated June 2, 2020, for Majestic's commercial use of real property located at 5269 Huntley Sullivan Road, Awendaw, SC (the "Real Property" or the "Premises"). (Am. Compl. ¶¶ 4, 7-8.) The

---

[1] Plaintiff did not attach a copy of the Lease Agreement or the two PSAs (discussed further below) to its amended complaint. However, Defendant attached copies of these agreements to its motion to dismiss. (*See* ECF No. 49-1 at Exs. 2, 3, 43, and 47.) Because these documents are integral to the amended complaint and are authentic, the Court will consider them.

Lease had an initial term ending on October 31, 2024, exclusive of any options contained in the Lease. (*Id.* ¶ 9.) Majestic agreed to pay base rent of $10,500.00 per month. (ECF No. 49-2 at 2.) The Lease contained a negotiated provision setting forth the rights and remedies of Majestic in the event D&D failed to remove all of its personal property stored on the Premises before June 30, 2020. (Am. Compl. ¶ 10.) Specifically, Section 18.15 of the Lease entitled, "Storage," states:

> Landlord and Tenant agree that Landlord may store personal property, prior business equipment, slabs, countertops and related property at the Leased Premises in a location reasonably designated by Tenant until June 30, 2020. If any of Landlord's personal property, prior business equipment, slabs, countertops and related property remains on the Leased Premises after June 30, 2020, such property shall be considered abandoned by Landlord, of no marketable value and Tenant may dispose of same at Landlord's cost, which such cost (estimated to be approximately $30,000) may be deducted from the Base Rent otherwise due to Landlord from Tenant. Until the earlier of Landlord's removal of its personal property from the Teased Premises or June 30, 2020, Base Rent payable hereunder shall be reduced by $750.04 per month (partial months to be prorated). In addition, **if Landlord's personal property has not been removed from the Leased Premises by June 30, 2020, Base Rent payable hereunder shall be reduced by X200.00 per day until all of Landlord's personal property has been removed from the Leased Premises**. Tenant will not be liable for any injury or damage to Landlord's personal property resulting from any cause whatsoever unless caused by or due to the gross negligence or willful misconduct of Tenant.

(ECF No. 49-2 at 12-13.) (emphasis added.) Section 18.5 of Lease entitled, "Remedies Cumulative," states that "[t]he various rights and remedies . . . are not exclusive of any other right or remedy . . . but are cumulative and are in addition to every other right or remedy now or hereafter existing at law or in equity." (*Id.* at 10.)

At the June 30, 2020, deadline, D&D removed some but not all its personal property, and it continued to remove its personal property after the deadline. (Am. Compl. ¶¶ 12-13). According to D&D, Majestic "routinely used Plaintiff's equipment, inventory,

2

and other personal property and materials in the operation of its business," both before and after the deadline. (*Id.* ¶¶ 11, 13.) D&D further alleges that the presence of D&D's property did not in any way inhibit Majestic's use or quiet enjoyment of the Premises. (*Id.* ¶ 13.) In accordance with the Lease, D&D accepted reduced rent from Majestic between July 1, 2020, and approximately the end[2] of 2021. (*Id.* ¶ 15.) According to D&D, by October 30, 2020, "all or substantially all" of its personal property had been removed from the Premises. (*Id.* ¶ 16.)

At the beginning of 2021, D&D began listing the Real Property for sale. (*Id.* ¶ 17.) Pursuant to a Purchase and Sale Agreement dated February 3, 2021[3] (the "First PSA"), D&D agreed to sell the Real Property to Steel City Storage, LLC ("Steel City") for $1,825,000.00. (*Id.* ¶ 17. *See* ECF No. 49-3.) D&D was obligated to assign and deliver the Lease with Majestic to Steel City at closing per the terms of the First PSA. (*Id.* ¶ 39. *See* ECF No. 49-3 at 2-3 (including the Lease among seller's deliveries).) The First PSA provided Steel City with a forty-five day "investigation period," running from February 3, 2021, through March 20, 2021, to review the seller's deliveries and investigate the Premises. (ECF No. 49-3 at 1, 3-4.) During this period, the First PSA was subject to an investigation contingency:

> 3.6 **Investigation Contingency**. If Purchaser shall not approve the Seller's Deliveries, the results of any Due Diligence, the Estoppel Certificate or if Purchaser determines that the Property is not suitable for Purchaser's intended use of the Property or is not satisfactory, for any reason or no reason, all as determined by Purchaser in Purchaser's sole and absolute discretion, Purchaser shall have the option to terminate this Agreement by written notice to Seller on or before the end of the Investigation Period and neither party shall have any further liability hereunder, other than any rights

---

[2] As noted by Defendant, it appears the allegation should read until the "beginning" of 2021, given Plaintiff's subsequent allegation that Majestic left the Premises by February 12, 2021. (Am. Compl. ¶ 28.)
[3] While the amended complaint alleges the date was February 2, 2021, the First PSA is dated February 3, 2021. (ECF No. 49-3 at 1.)

3

> or obligations set forth herein which are expressly to survive the Closing or termination of this Agreement (the "**Investigation Contingency**"). If Purchaser timely terminates this Agreement as provided in this Section 3.6, the Earnest Money shall be immediately returned to Purchaser and Purchaser shall promptly return the Seller's Deliveries to Seller. If Purchaser does not advise Seller in writing of its election to terminate this Agreement on or before the end of the Investigation Period, the Investigation Contingency shall be deemed waived and this Agreement shall remain in full force and effect. If Purchaser does not advise Seller in writing of its election to terminate this Agreement on or before the end of the Investigation Period, the Earnest Money shall be deemed nonrefundable, except as otherwise set forth herein, but shall also be applied towards the Purchase Price. Purchaser reserves the right to have the Property appraised by a professional appraiser of Purchaser's choice during the Investigation Period.

(ECF No. 49-3 at 4-5.)

D&D alleges that, on or around February 12, 2021, Majestic abandoned the Lease, stopped paying rent, and defaulted under the Lease. (Am. Compl. ¶ 18.) Majestic admits that it left the Premises on or about this date, "following six months or more of Plaintiff's admitted failure to meet its removal deadline." (ECF No. 49-1 at 3.)

D&D alleges that Steel City learned of Majestic's default, which D&D contends "directly caused [Steel City] to terminate the First PSA." (Am. Compl. ¶ 19. *See also id.* ¶ 22 ("The sole reason and cause of Buyer . . . electing to terminat[e] the PSA was because of Majestic abandoning" the Premises and no longer "performing its duties as tenant under the Lease.").) D&D was informed by Steel City that it had learned "from a source" that Majestic was looking at a new location and was seeking financing for same. (*Id.* ¶ 20.) D&D alleges, upon information and belief, that Majestic was looking elsewhere prior to February 1, 2021. (*Id.* ¶ 42.) D&D had difficulty finding another buyer at the same or similar price, but to mitigate its damages, it entered into an agreement on or around April 23, 2021 (the "Second PSA"), to sell the Real Property for $1,550,000.00. (*Id.* ¶¶ 24-25,

4

34.) D&D asserts that the $275,000.00 loss it suffered resulted from Majestic's abandonment and breach of the Lease. (*Id.* ¶ 25.)

D&D brings two causes of actions against Majestic. D&D asserts that Majestic breached the Lease by abandoning the Premises, by failing to pay its share of tax year 2020 Real Property ad valorem taxes owed under Section 4.3 of the Lease ($10,992.45.00), and by failing to pay monies due under Lease beginning November 1, 2020, through April 22, 2021 ($44,768.00). (*Id.* ¶ 23.) D&D also asserts a cause of action labeled "Tortious and Intentional Interference With Contract/Tortious Interference With Prospective Contractual Relations – First PSA." (*Id.* at 8.) D&D alleges Majestic "knew about or was aware of" the First PSA "and/or had prior knowledge that Plaintiff listed or was planning to list the Real Property" for sale. (*Id.* ¶ 38.) It claims that Majestic, "[b]y virtue of intentionally abandoning the Premise for an improper purpose or by improper methods" and by defaulting under the Lease, "tortiously interfered with and caused the First PSA to be breached by D&D and terminated because [it] was no longer able to deliver the Lease in good standing." (*Id.* ¶ 40.) Thus, D&D asserts that Steel City terminated the First PSA as a direct result of Majestic's intentional actions of abandoning and defaulting under the Lease. (*Id.* ¶¶ 41, 43.) D&D further contends that Majestic had no justification for its actions. (*Id.* ¶ 43.) D&D seeks damages in an amount no less than $330,760.45, plus fees and costs and punitive damages (only as to Count II). (*Id.* ¶¶ 35, 46.)

## **STANDARD OF REVIEW**

A motion to dismiss for failure to state a claim challenges the legal sufficiency of a complaint. *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "[A] motion to

dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Id.* In addition to the complaint itself, the Court may consider "documents attached to the complaint, . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The Court may also "take judicial notice of matters of public record." *Id.*

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). While a complaint "does not need [to allege] detailed factual allegations," pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]' 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

6

**DISCUSSION**

In its motion to dismiss, Defendant asserts that it is entitled to dismissal of Plaintiff's breach of contract claim because Plaintiff lacks standing to enforce the Lease because Plaintiff made an absolute assignment of the Lease when it executed an instrument entitled, "Assignment of Rents,"[4] in favor of its lender, CresCom Bank (the "Bank"). As to Plaintiff's second cause of action, Defendant construes the amended complaint as alleging two separate causes of action. First, Defendant asserts that it is entitled to dismissal of Plaintiff's "Tortious and Intentional Interference With Contract" claim because: (1) Plaintiff failed to allege at least three of the five essential elements of such a claim, and (2) Plaintiff's tort theory is fatally defective. Second, Defendant asserts that it is entitled to dismissal of Plaintiff's "Tortious Interference With Prospective Contractual Relations" because Plaintiff failed to properly plead the essential elements of this claim.

In response, Plaintiff argues that it has standing to assert a breach of contract claim because the Assignment of Rents was not an absolute assignment of all its interests in the Lease. Rather, it contends that the Assignment of Rents granted the Bank a mere security interest in and was a collateral assignment of the rents due under the Lease to secure the performance of its bank loan. Plaintiff also contends that the amended complaint plausibly alleges claims for both tortious interference with contract and with prospective contractual relations to withstand Defendant's 12(b)(6) motion.

---

[4] Defendant attached a copy of the Assignment of Rents to its motion to dismiss. (ECF No. 49-4.) The Assignment of Rents was recorded with the Charleston County Register of Deeds and is, therefore, a matter of public record. (*Id.* at 6.) Accordingly, the Court will take judicial notice of it.

### A. Breach of Contract Claim – Standing

Defendant claims Plaintiff lacks standing to enforce the Lease because Plaintiff assigned all rights in the instrument to the Bank. Plaintiff counters that the Assignment of Rents does not deprive it of standing to enforce the Lease because it merely granted a security interest to the Bank in rents due under the Lease. Thus, according to Plaintiff, the Assignment of Rents was not an assignment to the Bank of Plaintiff's interest as Landlord in the Lease.

Ordinarily, an assignment "vests the legal title in the assignee and places the property beyond the control of the assignor . . . ." 6 Am. Jur. 2d *Assignments for Benefit of Creditors* 75 (1963). When the assignor retains no rights to the assigned property, the assignor lacks standing to enforce any agreements regarding the assigned property. *Crestwood Golf Club, Inc. v. Potter*, 493 S.E.2d 826, 833 (1997).

A review of the Assignment of Rents reveals the following: Plaintiff and the Bank executed an instrument entitled, "Assignment of Rents," dated February 13, 2019. (ECF No. 49-4.) Through the Assignment of Rents, Plaintiff assigned, "grant[ing] a continuing security interest in," and conveyed to the Bank "all of [Plaintiff]'s right, title and Interest in and to the Rents" from the Real Property. (*Id.* at 1.) "Rents" is defined as:

> all of [the Bank]'s present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation [the Bank]'s right to enforce such leases and to receive and collect payment and proceeds thereunder.

(*Id.* at 4.)

8

The Assignment of Rents reflects that, also on February 13, 2019, Plaintiff and the Bank executed a loan agreement secured by a promissory note (the "Note") in the original principal amount of $1,580,000.00. (*Id.* at 4.) The Assignment of Rents secured, in addition to the amounts specified in the Note, all future amounts the Bank in its discretion may loan to Plaintiff. (*Id.* at 1.) Specifically, it states: **THIS ASSIGNMENT IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF BORROWER AND GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND ALL RELATED DOCUMENTS**." (*Id.*) (emphasis is original).

As to payment and performance, it provides that "[u]nless and until [the Bank] exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, [Plaintiff] may remain in possession and control of and operate and manage the Property and collect the Rents . . . ." (*Id.*) The Assignment of Rents "provide[s] below" that the Bank "shall have the right at any time, and even though no default shall have occurred under this Assignment," to collect and receive the Rents. (*Id.*) Indeed, for this purpose, the Bank may: (1) "enter upon and take possession of the Property"; (2) "demand, collect and receive from the tenants or from any other persons liable therefore, all of the Rents"; (3) "institute and carry on all legal proceedings necessary for the protection of the Property"; (4) "collect the Rents and remove any tenant or tenants or other person from the Property"; and (5) "rent or lease the whole or any part of the Property for such term or terms and on such conditions [it] may deem appropriate." (*Id.*) This provision concludes with, the Bank "may do all such other things and acts with respect to the Property as [it] may deem appropriate and may act exclusively and solely

9

in the place and stead of [Plaintiff] and to have all of the powers of [Plaintiff] for the purposes stated above." (*Id.* at 2.)

It further provides that, aside from any costs or expenses incurred by the Bank in connection with the Property, the Rents "shall be applied to the indebtedness." (*Id.* at 2.) And, after full performance by Plaintiff, the Bank "shall execute and deliver" a satisfaction of the Assignment of Rents and "statements of termination of any financing statement on file evidencing [the Bank]'s security interest in the Rents and the Property." (*Id.*)

In support of its lack of standing argument, Defendant relies heavily on this language: "Grantor . . . conveys all of Grantor's rights, title and Interest in and to the Rents . . . ." (*Id.* at 1.) Defendant contends that this language means the instrument was an absolute assignment of the lease, "leaving Plaintiff with nothing to enforce" and, in so arguing, it relies on *Kennedy v. Gardner*, 611 S.E.2d 480 (2005), and *Galphin v. Bennett*, 213 S.C.216 (1948). (ECF No. 49-1 at 11-12.) The Court disagrees and finds Defendant's reliance on *Kennedy* and *Galphin* misplaced.

*Kennedy* and *Galphin* dealt with an assignment assigning the entirety of a specific lease, not an assignment of rents from any present or future leases on the Real Property, executed along with a promissory note, in order to secure a bank loan. The memorandum of assignment of lease in *Kennedy* contained the following language: "Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in and to the above-referenced lease for the premises located at . . . ," and the Court of Appeals of North Carolina held that it was "an absolute assignment as its leaves [Assignor] with no interest in the assigned property." 611 S.E.2d at 482-83. In *Galphin*, a lease was assigned to the defendant, with all the rights, powers and privileges described

and set forth in the lease; therefore, the Court found the defendant had the right to extend the lease. 213 S.C. at 28. Contrary to these straightforward assignments of leases, here, we have an Assignment of Rents containing several provisions, as set forth above, establishing that the instrument is merely granting a security interest in rents due under leases on the Real Property, to secure Plaintiff's bank loan, and is providing rights, but not obligations, to the Bank to collect said rents. Moreover, it is evident that Plaintiff is not divesting itself of all interest in and rights to the Real Property, as was clearly the case in *Kennedy* and *Galphin*. *Cf. Crestwood Golf Club*, 493 S.E.2d at 833 ("When the assignor retains no rights to the assigned property, the assignor lacks standing to enforce any agreements regarding the assigned property.") Rather, provided there is no default, Plaintiff "may remain in possession and control of and operate and manage the Property and collect the Rents . . . ." (ECF No. 49-4 at 1.) Further, if Plaintiff "pays all of the indebtedness when due and otherwise performs all the obligations imposed upon [it] under the Assignment [of Rents], the Note, and the Related Documents, [the Bank] shall execute" a satisfaction of the Assignment of Rents and statements of termination of any financing statements on file "evidencing [the Bank]'s security interest in the Rents and the Property." (*Id.* at 2.) Thus, just as the Supreme Court of South Carolina found in *Crestwood Golf Club*, this Court finds that, while the Assignment of Rents contains language assigning to the Bank "all of [Plaintiff]'s rights, title, and Interest in and to the Rents," the vast majority of the other language in the instrument "indicates [that] the sole purpose of the assignment is to provide additional security for [Plaintiff]'s . . . debt to [the] Bank." *Crestwood Golf Club, Inc.*, 493 S.E.2d at 833. In sum, given the entirety of the

language of the Assignment of Rents, the Court finds that Plaintiff maintained its right to bring the instant action and that Defendant's standing argument lacks merit.

### B.     Tort Claims – Failure to State a Claim

In addition to breach of contract, Plaintiff brings a second cause of action, captioned, "Tortious and Intentional Interference With Contract/Tortious Interference With Prospective Contractual Relations – First PSA." (Am. Compl. at 8.) As noted above, however, Defendant and Plaintiff view these allegations as asserting two separate causes of actions in their memoranda: (1) tortious interference with contract and (2) tortious interference with prospective contractual relations. (*See* ECF Nos. 49-1, 64.) Defendant contends that both causes of actions must be dismissed because Plaintiff has failed to plead the essential elements for both claims of tortious interference. In response, Plaintiff argues that it has sufficiently alleged the elements of these causes of action to withstand a motion to dismiss. Defendant also argues, alternatively, as to the tortious inference with contract claim, that it must be dismissed because "Plaintiff's tort theory is fatally defective." (ECF No. 49-1 § D.) In response, Plaintiff contends that the economic loss rule does not bar its claim and, at a minimum, it claims such an argument is premature at this stage. (ECF No. 64 at 22-23.)

South Carolina recognizes a claim for intentional interference with contract, also known as tortious interference with contractual relations, and a claim for intentional interference with prospective contractual relations. To state a claim as to the former, a plaintiff must allege (1) the existence of a contract; (2) the defendant's knowledge of the contract's existence; (3) the defendant's intentional procurement of the breach of the contract; (4) the absence of justification; and (5) resulting damage. *Camp v. Springs*

12

*Mortgage Corp.*, 426 S.E.2d 304, 305 (S.C. 1993). Additionally, "to recover on a cause of action for intentional interference with prospective contractual relations, . . . the plaintiff must prove: (1) the defendant intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff." *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 395 S.E.2d 179, 180 (S.C. 1990) (citing Restatement (Second) of Torts § 766B (1979)).[5]

"The plaintiff must actually demonstrate, at the outset, that he had a truly prospective (or potential) contract with a third party." *United Educ. Distribs., LLC v. Educ. Testing Serv.*, 564 S.E.2d 324, 328-29 (Ct. App. 2002) (stating that "the allegations must present facts that give rise to some reasonable expectation of benefits from the alleged lost contracts"). "The agreement must be a close certainly"; "the mere hope of a contract is insufficient." *Id.* at 330. Generally, there can be no finding of intentional interference with prospective contractual relations if there is no evidence to suggest any purpose or motive by the defendant other than the proper pursuit of its own contractual rights with a third party. *Southern Contracting, Inc. v. H.C. Brown Constr. Co.*, 450 S.E.2d 602, 606 (Ct. App.1994). If a defendant acts for more than one purpose, his improper purpose must predominate in order to create liability. *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 395 S.E.2d 179, 180 (1990). "As an alternative to establishing an improper purpose, the plaintiff may prove the defendant's method of interference was improper under the circumstances." *Crandall*, 395 S.E.2d at 180. *See, e.g., MST, LLC v. N. Am.*

---

[5] The Restatement (Second) of Torts § 766B (1979) additionally provides:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

13

*Land Tr.,* No. 2:22-CV-00874-DCN, 2023 WL 3571500, at *9 (D.S.C. May 19, 2023) (providing examples such as: "violations of statutes, regulations, or recognized common-law rules. Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship").

Viewed in the light most favorable to Plaintiff, the amended complaint offers the following factual allegations in support of Plaintiff's combined tortious interference claims: Plaintiff alleges one specific prospective purchaser, Steel City, and one identifiable contract, the First PSA, which Plaintiff and Steel City entered on February 3, 2021, to purchase the Real Property. Plaintiff alleges that Defendant knew about and was aware of the First PSA and/or had prior knowledge that Plaintiff listed or was going to list the Real Property for a prospective contract for sale. Plaintiff alleges that prior to February 1, 2021, Defendant engaged a lender to assist in potential financing for a new location and, at some unknown time, listed the opening of its new location's address on its website. Then, Plaintiff contends that, "[s]ubsequent to [it] entering into the First PSA . . . [Defendant] abandoned the Lease, stopped paying rent altogether, and defaulted under [the] Lease obligations." (Am. Compl. ¶ 18.) Plaintiff alleges that Steel City "became aware of" Defendant's actions and discovered "from a source" that Defendant had identified a new location and was seeking financing for same. (*Id.* ¶¶ 19-20.) Plaintiff asserts that because the First PSA required it to assign and deliver the Lease to Steel City at closing, Defendant's intentional actions of abandoning the Premises and defaulting under the Teams of the Lease caused Plaintiff to breach the First PSA, which in turn led

14

Steel City to terminate the First PSA during the contingency period. In sum, Plaintiff alleges that Steel City would not have terminated the First PSA but for Defendant's intentional actions in abandoning the Premises and defaulting on the Lease without justification and for an improper purpose or by improper methods. Plaintiff further alleges that, as a result, it has been damaged.

Defendant argues that Plaintiff's tort claims must be dismissed because there are no allegations that Steel City breached the First PSA or that Defendant communicated with Steel City, to persuade or induce Steel City to terminate the First PSA. As to the first argument, while it is true Plaintiff did not and cannot allege that Steel City *breached* the First PSA, the Court is not persuaded dismissal on this ground is proper. Rather, it finds the allegations that Defendant intentionally and without justification interfered with the ability of Plaintiff to meet the necessary conditions of the contract, causing Steel City to terminate the contract with Plaintiff, sufficient to withstand a motion to dismiss. "The ability of one party to a contract to avoid it based on a *proper* ground, if the party *elects* to do so, does *not* mean that any third person is free to tortiously interfere with the parties' contract for an *improper* purpose." *Branco v. Hull Storey Retail Grp., LLC*, No. 2021-000233, 2023 WL 3614244, at *6 (S.C. May 24, 2023) (emphasis in original) (reversing and finding record supported trial court's ruling in favor of Petitioners on claim of tortious interference with contractual relations based on similar allegations – i.e., planned sale of assets between plaintiff and a third party, defendant was aware of the assert sale, third party exercises right under contract not to purchase assets due to defendant's intentional

interference with ability of plaintiff to meet conditions of asset sale[6]). As to the lack of allegations of any communications between Defendant and Steel City, the Court agrees with Plaintiff that the absence of such allegations, while potentially problematic down the road, is not fatal at this early stage. Defendant's argument is based on one case outside this District, and the Court, on its own initiative, was unable to locate any case law within this District supporting that one must assert such allegations to sufficiently plead the third element of this claim. Thus, the Court holds that the facts alleged support an interference that Defendant's actions in intentionally abandoning the Premises, defaulting on the Loan, and seeking a new location and financing for same, without justification, induced or caused Steel City to terminate the First PSA with Plaintiff.

Defendant also argues that Plaintiff's "material breaches" in failing to remove its personal property from the Premises, "gave Majestic the right to end the lease and vacate." (ECF No. 49-1 at 22-23.) Thus, it contends it acted in pursuit of its own legal right to default on the Lease. (*Id.*)

It is established that "[t]he exercise in good faith of a legal right by a party to a contract affords no basis for an action by the second party for intentional interference with a contract even though the consequence of the exercise of the legal right by the first party is to cause a third party not to perform another contract with the second party." *Webb v. Elrod*, 418 S.E.2d 559, 561 (Ct. App. 1992). *See, e.g., BCD LLC v. BMW Mfg. Co., LLC*, 360 F. App'x. 428, 435 (4th Cir. 2010) ("Absence of justification means conduct that is carried out for an improper purpose, such as malice or spite, or through improper means,

---

[6] *Branco v. Hull Storey Retail Grp., LLC,* No. 2015CP430596, 2017 WL 1504736, at *2 (S.C. Com. Pl. Mar. 23, 2017).

such as violence or intimidation. A party is justified, however, when acting in the advancement of its legitimate business interests or legal rights.") (applying South Carolina law).

Notably, in making this argument, Defendant does not point to language in the Lease showing or supporting that it had a legal right to default on the Lease due to Plaintiff's failure to remove its personal property. Nor does Defendant point to language in the Lease showing or supporting that such conduct by Plaintiff constituted a "material" breach of the Lease, thereby discharging Defendant from its obligations. This Court's own review of the Lease reveals no such language showing or supporting that Defendant was justified in taking these actions. Rather, as noted by Plaintiff and outlined above, Section 18.15 of the Lease entitled, "Storage," outlines Defendant's specific remedy should Plaintiff engage in such conduct, *i.e.,* disposal of property at landlord's cost; rent abatement). (ECF No. 49-2 at 12-13.) Given the language of the Lease and viewing the allegations in a light most favorable to Plaintiff, the Court cannot hold as a matter of law that Defendant's alleged conduct in abandoning and defaulting on the Lease was justified in these circumstances. Rather, it holds that Plaintiff has plausibly alleged that Defendant abandoned and defaulted on the Lease, absent justification, to cause Steel City to terminate the First PSA, resulting in Plaintiff's loss of profits.

Finally, the Court is not persuaded that Plaintiff's tort claims are barred by the economic loss rule. The economic loss rule "define[s] the line between recovery in tort and recovery in contract." *Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 49 (S.C. 2009). The rule generally prohibits recovery of purely economic damages through a tort cause of action because "[a] breach of a duty which arises under the provisions of a contract

17

between the parties must be redressed under the contract, and a tort action will not lie." *Tommy L. Giffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995). Courts, however, recognize exceptions to this rule. *See id.* (recognizing recovery for pure economic damages in legal malpractice and architect liability cases). These exceptions "maintain[ ] the dividing line between tort and contract while recognizing the realities of modern tort law." *Id.* The controlling inquiry "is not whether the damages are physical or economic" but "the source of the duty plaintiff claims the defendant owed." *Id.*

Plaintiff's breach of contract claim concerns Defendant's abandonment of the Real Property, failure to pay its share of the tax year 2020 Real Property ad valorem taxes, and failure to pay rent. Plaintiff's tortious interference claims add the additional factual element of intentionally interfering with an entirely separate contract – the First PSA – between Plaintiff and Steel City. Additionally, the legal elements between Plaintiff's breach of contract claim and tortious interference claims differ, as the tortious interference claims require an element of intent not necessary to its breach of contract claim. Further, "without a doubt[,] Defendant has a duty to refrain from interfering with another's contractual relationships." *ITW Charlotte, LLC v. ITW Com. Constr., N. Am. a division of Illinois Tool Works, Inc.*, No. 317CV00473FDWDCK, 2017 WL 6542511, at *3 (W.D.N.C. Dec. 21, 2017) (discussing economic loss doctrine under North Carolina law). *See Dunlap v. Cottman Transmissions Sys., LLC*, 576 F. App'x. 225, 226 (4th Cir. 2014) (Virginia law) (noting that tortious interference with contract is an intentional tort predicated on the common law duty to refrain from interfering with another's contractual and business relationships). Thus, the Court finds that Plaintiff has alleged sufficient facts

to support a plausible claim for an identifiable and independent tort that is distinct from a mere breach of contract claim. Accordingly, the Court declines to dismiss Plaintiff's tortious interference claims on the ground that Plaintiff's tort theory is defective.

## **CONCLUSION**

Based on the foregoing, the Court denies Defendant's motion to dismiss the amended complaint. (ECF No. 49.)

**IT IS SO ORDERED.**

                                                  /s/ Bruce Howe Hendricks
                                                  United States District Judge

February 5, 2024
Charleston, South Carolina